UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT
_____

No. 24-1467
_____
_____

UNITED STATES,
Appellee,

v.

ERIC ROBERT JOHNSON,
Defendant-Appellant.
_____

ON APPEAL FROM A JUDGMENT OF THE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
_____

BRIEF OF DEFENDANT-APPELLANT
ERIC ROBERT JOHNSON
_____

Christine DeMaso
Assistant Federal Public Defender
Federal Public Defender Office
District of Massachusetts
51 Sleeper Street, 5th Floor
Boston, MA 02210
(617) 223-8061
Identification No.: 1168061

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ............................................................................... i

TABLE OF AUTHORITIES.......................................................................iii

JURISDICTIONAL STATEMENT ...........................................................1

ISSUE PRESENTED FOR REVIEW .......................................................1

STATEMENT OF THE CASE....................................................................1

   I.    How Freenet works. ...................................................................2

   II.   Law-enforcement surveillance of Freenet..............................5

   III.   The search warrant for Mr. Johnson's house. .......................7

   IV.   Proceedings below. ....................................................................8

SUMMARY OF ARGUMENT...................................................................10

ARGUMENT.................................................................................................11

   I.    The district court erroneously denied Mr. Johnson's motion to suppress where the warrant to search his house relied on an unconstitutional warrantless search. Without the information from this warrantless search, the warrant does not provide probable cause to believe a crime was committed or that evidence of a crime would be found in Mr. Johnson's home. ...............................................11

      A.   Standard of review.................................................................11

B.      General Fourth Amendment principles. ..........................................12

C.      Mr. Johnson had a reasonable expectation of privacy in his
        activities on Freenet, making the government's use of     modified
        Freenet a warrantless search that violated his Fourth
        Amendment rights...............................................................................14

    i.      The third-party doctrine is not to the contrary. ...........................24

    ii.     Cases involving undercover officers are not to the contrary.....29

    iii.    Moore-Bush is not to the contrary. ..................................................31

    iv.     Cases involving other peer-to-peer programs are inapplicable
            because Freenet operates in a meaningfully different way. ......33

D.      The government's actions constituted an unconstitutional
        warrantless search. ..............................................................................36

E.      The good-faith exception does not apply.......................................37

F.      The warrant to search Mr. Johnson's home depended on
        information gleaned from the unconstitutional warrantless
        search of Freenet. When this information is removed from the
        warrant application, there is no probable cause, and the fruits of
        the warrant must be suppressed. ......................................................38

CONCLUSION ....................................................................................................40

CERTIFICATE OF COMPLIANCE WITH RULE 32(A) .................................41

CERTIFICATE OF SERVICE ............................................................................42

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Arizona v. Gant*,
    556 U.S. 332 (2009) ....................................................13

*Bond v. United States*,
    529 U.S. 334 (2000) ....................................................13

*Boyd v. United States*,
    116 U.S. 616 (1886) ....................................................12

*Carpenter v. United States*,
    585 U.S. 296 (2018) ..............................................*passim*

*Davis v. United States*,
    564 U.S. 229 (2011) ....................................................37

*Florida v. Jardines*,
    569 U.S. 1 (2013) ........................................................13

*Harper v. Werfel*,
    118 F.4th 100 (1st Cir. 2024) .........................16, 25, 26

*Hoffa v. United States*,
    385 U.S. 293 (1966) ...............................................29, 30

*Katz v. United States*,
    389 U.S. 347 (1967) ..........................12, 13, 15, 24, 37

*Klayman v. Obama*,
    957 F. Supp. 2d 1 (D.D.C. 2013),
    *vacated and remanded*, 800 F.3d 559 (D.C. Cir. 2015) ...............................27

*Kyllo v. United States,*
    553 U.S. 27 (2001) ...............................................................12, 18, 19, 26, 37

*Lewis v. United States,*
    385 U.S. 206 (1966) ...............................................................30

*Pagán-González v. Moreno,*
    919 F.3d 582 (1st Cir. 2019) ...............................................................29

*Smith v. Maryland,*
    442 U.S. 735 (1979) ...............................................................13, 14, 27

*State v. Zuck,*
    2021 WL 2103598 (Ct. App. Ariz) ...............................................................34

*United States v. Arumugam,*
    2020 WL 1154651 (W.D. Wash.) ...............................................................33, 34

*United States v. Bain,*
    874 F.3d 1 (1st Cir. 2017) ...............................................................12, 13

*United States v. Brunette,*
    256 F.3d 14 (1st Cir. 2001) ...............................................................37, 38

*United States v. Bucci,*
    582 F.3d 108 (1st Cir. 2009) ...............................................................31

*United States v. Carme,*
    2020 WL 3270877 (D.Mass.) ...............................................................35

*United States v. Coombs,*
    857 F.3d 439 (1st Cir. 2017) ...............................................................14, 39

*United States v. Dessesaure,*
    429 F.3d 359 (1st Cir. 2005) ...............................................................14, 38

*United States v. Dickerman*,
    954 F.3d 1060 (8th Cir. 2020).............................................17, 21, 30

*United States v. Dickerman*,
    2017 WL 11485604 (ED. Mo.)....................................................34

*United States v. Di Re*,
    332 U.S. 581 (1948) .......................................................................12

*United States v. DiTomasso*,
    56 F.Supp.3d 584 (S.D.N.Y. 2014) ...........................................35

*United States v. Ganoe*,
    538 F.3d 1117 (9th Cir. 2008)................................................33, 34

*United States v. Gratkowski*,
    964 F.3d 307 (5th Cir. 2020)........................................................25

*United States v. Jones*,
    565 U.S. 400 (2012) ..........................................15, 17, 22, 26, 27

*United States v. Miller*,
    425 U.S. 435 (1976) .....................................................................25

*United States v. Moalin*,
    973 F.3d 977 (9th Cir. 2020)..................................................26, 27

*United States v. Moore-Bush*,
    36 F.4th 320 (1st Cir. 2022) (en banc)......................... 15, 22, 24, 26, 31, 37

*United States v. Morel*,
    922 F.3d 1 (1st Cir. 2019) ...........................................................18

*United States v. Pobre*,
    2022 WL 1136891 (D. Md.)..............................................*passim*

*United States v. Sheehan*,
    70 F.4th 36 (1st Cir. 2023) ....................................................14, 39

*United States v. Shipton*,
    2019 WL 5330928 (D.Minn.) ...............................................33, 34

*United States v Sigouin*,
    494 F.Supp.3d 1252 (S.D. Fla. 2019) ......................17, 18, 21, 30

*United States v. Stults*,
    575 F.3d 834 (8th Cir. 2009)........................................................33

*United States v. Taylor*,
    935 F.3d 1279 (11th Cir. 2019)...................................................15

*United States v. Thompson*,
    2023 WL 424212 (D.N.Dak.) ................................................33, 34

*United States v. Trader*,
    981 F.3d 961 (11th Cir. 2020)......................................................25

*United States v. Tuggle*,
    4 F.4th 505 (4th Cir. 2021) .............................................23, 31, 32

*United States v. Weast*,
    811 F.3d 743 (5th Cir. 2016)........................................................33

*United States v. Wurie*,
    728 F.3d 1 (1st Cir. 2013),
    *aff'd by Riley v. California*, 573 U.S. 373 (2014).............11, 12, 13

*Wong Sun v. United States*,
    371 U.S. 471 (1963) ...................................................................39

## Constitutional Provisions

U.S. Const. Amend. IV .................................................................*passim*

## Statutes

18 U.S.C. §2252A .................................................................2, 8

18 U.S.C. §2708.................................................................38

18 U.S.C. §3231.................................................................1

28 U.S.C. §1291.................................................................1

## Books

Laura K. Donohue, *The Future of Foreign Intelligence* (2016) ...........................27

## Websites

Freenet Project, *Help*, https://staging.freenetproject.org/pages/help.html
(last visited Dec. 30, 2024)......................................................2, 3

Hyphanet, *Hyphanet*, https://www.hyphanet.org/index.html (last visited
Dec. 30, 2024) .................................................................3

Wikipedia, *Hyphanet*, en.wikipedia.org/wiki/Hyphanet (last visited Dec.
30 2024) .................................................................3

# JURISDICTIONAL STATEMENT

The district court had jurisdiction under 18 U.S.C. §3231, which grants the district courts exclusive jurisdiction over all federal offenses.

This Court has jurisdiction pursuant to 28 U.S.C. §1291, which confers jurisdiction to review final district court decisions.

The court entered judgment on May 10, 2024, and a timely notice of appeal was filed the same day. Add. 6; JA.I 15; JA.II 804.[1]

# ISSUE PRESENTED FOR REVIEW

1. Whether the district court erred in denying Mr. Johnson's motion to suppress where the warrant to search his home relied on information obtained through the government's unconstitutional warrantless search of a peer-to-peer network called Freenet?

# STATEMENT OF THE CASE

For years, government agents have used a proprietary computer program to monitor, record, and analyze the activities of users on Freenet, a peer-to-peer network. *See United States v. Pobre*, 2022 WL 1136891, at *2 (D. Md.); JA.II 510. Law enforcement officers run this program without a

---

[1] Citations are as follows: Add. is the addendum to this brief and JA.X is volume X of the joint appendix.

warrant or judicial oversight. In 2021, this surveillance program indicated that a Freenet user at an IP address connected with Mr. Johnson requested portions of three files law enforcement had identified as containing child sexual abuse material (CSAM). JA.I 59-62. Relying on this warrantless search of Freenet, officers got a warrant to search Mr. Johnson's home. JA.I 50-83. Officers found CSAM in Mr. Johnson's house and charged him with one count of possession of child pornography in violation of 18 U.S.C. §§2252A(a)(5)(B) and (b)(2). JA.I 19-22. Mr. Johnson moved to suppress everything found in the search of his house because the warrant relied on the fruits of the unconstitutional warrantless search of Freenet. JA.I 25-49. The district court denied this motion. Add. 1-5. Mr. Johnson entered a conditional guilty plea reserving his right to appeal the denial of this motion. JA.II 796-803.

## I.    How Freenet works.

Freenet describes itself as "a peer-to-peer platform for censorship-resistant communication and publishing" that permits users to "[b]rowse websites, post on forums, and publish files within Freenet with strong privacy protections." JA.II 747; *see also* Hyphanet, *Hyphanet*, https://www.hyphanet.org/index.html (last visited Dec. 30, 2024); Freenet

Project, *Help*, https://staging.freenetproject.org/pages/help.html (last visited Dec. 30, 2024); Wikipedia, *Hyphanet*, en.wikipedia.org/wiki/Hyphanet (last visited Dec. 30, 2024); JA.II 499-500.[2] Many peer-to-peer networks have a similar model: users make files on their computers available to other users in exchange for access to files the other users choose to share. Freenet is different; it is a network of linked computers (also called nodes) that stores data in fragments distributed among its users. *See* JA.II 671-75. When a user uploads a file to Freenet, Freenet breaks the file into blocks, encrypts the blocks, and stores them "randomly across Freenet's network of peers." Add.2. Users do not store complete files in Freenet, and they cannot view the content of the encrypted blocks that are stored on their computers. JA.II 571, 671-75.

When a file is inserted into the network, Freenet assigns it a "manifest key." Add. 2. The user who inserted the file gets the manifest key, to share or not, as that user chooses. JA.II 678-79. Users must have this

_____

[2] In June 2023, Freenet changed its name to Hyphanet. JA.II 686. This brief refers to the program as Freenet since that was its name during the charged conduct and the name that was used below.

key[3] to request, reassemble, and access the file. Add. 2. When a user enters a manifest key, Freenet searches for all the blocks that comprise the corresponding file. JA.I 52-56; JA.II 572-73. The search begins with the requester's neighboring nodes—Freenet determines how many blocks the file has and divides the necessary block requests evenly among the user's neighboring nodes. JA.I 52-56. If, for example, the file had 1000 blocks and the user had 10 neighbors, Freenet would send a request for 100 of the blocks to each of the 10 neighbors.[4] *Id*. If those nodes do not have the requested blocks, the requests are relayed to *their* neighbors the same way. *Id.* If, for example, one of the first-level neighbors did not have any of the 100 blocks, and that neighbor had 10 of its own peers, it would request 10 blocks from each of its neighbors. *Id*. These cascading requests (also called hops) do not continue indefinitely. *Id.*; JA.II 615-17; *Pobre*, 2022 WL 1136891 at *2 ("The number of times a request is sent from one peer level to another is known as the 'hops-to-live' [HTL] count."). Freenet will only forward a

---

[3] A typical manifest key looks like: CHK @ SVbD9~HM5nzf3AX4yFCBc-A4dhNUF5DPJZLL5NX5Brs,bA7qLNJR7IXRKn6uS5PAySjIM6azPFvK~18 kSi6bbNQ , AAEA—8. JA.II 501; *see also* JA.II 572-73 (describing manifest key as "long," "user unfriendly piece of text").

[4] The number of blocks contained in a file, as well as the number of neighboring nodes, varies.

request for a block 17 or 18 times before the request fails.[5] JA.I 52-55; JA.II

615-17; *Pobre*, 2022 WL 1136891 at *2

Users join Freenet by downloading free, open-source software. Add.

2. Users can join in opennet or darknet mode. In opennet mode, Freenet

connects a user to random, unknown peers. *Id.* In darknet mode, a user is

only connected to peers the user selects. *Id.* During the download process,

prospective users are told that Freenet performs best in opennet mode, but

that "[i]t may be quite easy for others to discover your identity." *Id.*; *see also*

JA.II 756. Users are told that although Freenet "is much safer than

traditional P2P software like BitTorrent or Gnutella,…an attacker with

moderate resources may be able to trace your activity on Freenet back to

you." JA.II 755; *see also* JA.II 554, 559-60 (agreeing that "Freenet does not

guarantee anonymity. Freenet tries to obscure anonymity….").

## II.    Law-enforcement surveillance of Freenet.

In the last decade, researchers developed a mathematical formula

that can be used to determine whether a particular Freenet user originated

---

[5] The system randomly decides whether a given request will be forwarded
17 or 18 times. JA.I 52-55; JA.II 615-17. This randomization is an effort to
protect the anonymity of the originator of a block request. *Id.*

a block request or was relaying a request from another user. JA.II 509-10;

JA.I 258-81; Add. 2. They used this research and formula to modify Freenet

to serve law-enforcement purposes. *Id*. This modified version of Freenet

(sometimes called Freenet Roundup) is only available to trained law-

enforcement officers. JA.II 454-55; Add. 2. In 2018, one of the developers of

modified Freenet, estimated that law enforcement operated 1% of the

nodes on Freenet. Add. 2. He opined that with this proportion of nodes,

any user had a 40% chance of being surveilled by law enforcement on

Freenet. JA.II 719-20.

Modified Freenet is meant to be operated in opennet mode, so the

officer is connected to random, unknown peers.[6] Add. 2. Modified Freenet

gathers and analyzes information about the users connected to and the

requests made to the law-enforcement node. *Id.* Modified Freenet monitors

all requests made to the law-enforcement node and isolates requests with

an HTL count of 16, 17, or 18 (such that they could be original requests). *Id*.

Modified Freenet then determines whether the hash value of the requested

---

[6] Modified Freenet likely also works in darknet mode. *See* JA.I 275 ("We consider only opennet, though our technique should work for either."); *see also* JA.I 259.

block matches a law-enforcement database that contains hash values of files that the government has identified as CSAM. *Id*. If the requested block matches a CSAM file, modified Freenet applies the formula the professors developed.[7] JA.II 623-26; *see also Pobre*, 2022 WL 1136891 at *3 (explaining modified Freenet in detail). This formula reveals whether the user who requested this block from the law-enforcement node was likely the original requester of the file. JA.I 258-81.

## III. The search warrant for Mr. Johnson's house.

Officers got a warrant to search Mr. Johnson's home on February 18, 2022. JA.I 76. The warrant affidavit explained Freenet and modified Freenet. JA.I 51-59. It stated that law-enforcement use of modified Freenet indicated that a user with IP address 108.7.62.70 requested blocks from files containing CSAM on three occasions.[8] JA.I 59-62. The warrant application

---

[7] The formula looks like this:

$$Pr(H1|r) = \frac{\frac{1}{g+1}B\left(r;T,\frac{1}{g}\right)}{\frac{1}{g+1}B\left(r;T,\frac{1}{g}\right) + \frac{g}{g+1}B\left(r;T,\frac{1}{gh}\right)}. \qquad (6)$$

JA.I 276-77 (g is number of subject's peers, including the observer; r is requests received from subject by observer; T is total requests made by requester; and h is number of peers assumed connected to hypothetical source that is not subject).

[8] Modified Freenet noted these requests on May 29-30, 2021, June 3, 2021, and June 8, 2021. JA.I 59-62.

described the content of these files.[9] *Id.* Officers determined that Verizon

serviced this IP address, and a subpoena to Verizon revealed that this IP

address was assigned to Eric Johnson at an address in Billerica. JA.I 62-64.

Records confirmed that Mr. Johnson lived at that address, and officers saw

him there. *Id.* Absent the information obtained from the warrantless search

of Freenet, the affidavit did not provide probable cause to believe that a

crime had been committed or that evidence would be found at Mr.

Johnson's house.

Officers searched Mr. Johnson's house on February 23, 2022. JA.II

422-23. They found, inter alia, an external hard drive containing child

pornography. *Id.*

## IV. Proceedings below.

Mr. Johnson was charged with one count of possession of child

pornography in violation of 18 U.S.C. §§2252A(a)(5)(B) and (b)(2). JA.I 19-

24. He filed a motion to suppress arguing that the fruits of the search of his

---

[9] It also detailed "characteristics common to consumers of child
pornography," including that they typically maintain collections of child
pornography. JA.I 64-67. The application contained general information
about computers, the internet, and other technology involved in viewing
and storing child pornography. JA.I 67-76. It explained how officers would
search computers and other media. *Id.*

house had to be suppressed because the warrant relied on the unconstitutional warrantless search of Freenet. JA.I 25-49. The government opposed this motion and Mr. Johnson filed a reply. JA.II 415-39, 479-97. The court held a two-day suppression hearing at which one witness, Dr. Brian Levine, testified. JA.II 519-746. Dr. Levine is one of the academics who developed modified Freenet. As described throughout this brief, Dr. Levine explained how Freenet and modified Freenet work.

The court denied Mr. Johnson's motion to suppress, holding that he "did not have a reasonable expectation of privacy in his use of Freenet and, accordingly, his Fourth Amendment challenge fails." Add. 4. It wrote that *Carpenter* did not apply to this case where Mr. Johnson "chose to participate in a peer-to-peer network designed to allow censorship-resistant communication and with measures to protect anonymity, but that warned any user that his identification could be discovered and that the choice of Opennet will allow connections with strangers…." Add. 4-5. It likened the government's use of modified Freenet to "'an undercover officer crashing a public meeting.'" Add. 5 (quoting *Pobre*, 2022 WL 1136891 at *6). It wrote that *Pobre* and cases involving other peer-to-peer networks were persuasive. *Id.*

Mr. Johnson entered a conditional guilty plea preserving his right to appeal the denial of this motion to suppress. JA.II 796-803. He was sentenced to 120 months of incarceration. Add. 6-20. The judgment issued on May 10, 2024, and he filed a timely notice of appeal the same day. Add,6; JA.I 15; JA.II 804.

## SUMMARY OF ARGUMENT

Mr. Johnson chose to use Freenet, a censorship-resistant and anonymity-protective program, to request files. This program had privacy-protective measures that do not exist in typical peer-to-peer software. Although Freenet users expose their IP addresses, the program "tries not to allow what you're doing to be attributed to you" and does so "successfully for any single request." JA.II 597. Given the way Freenet functioned, Mr. Johnson had a reasonable expectation of privacy in the sum of his conduct on Freenet, particularly in the requests he made. The government's use of sophisticated research and proprietary technology to pierce Freenet's privacy protections was a search under the Fourth Amendment. The government did not have a warrant to surveil Freenet, and the fruits of this warrantless search must be suppressed. The warrant to search Mr. Johnson's house relied on information obtained through the warrantless

search of Freenet. When this information is excised from the warrant

application, there is no probable cause to believe that a crime had been

committed or that evidence would be found in Mr. Johnson's home. The

fruits of the search of Mr. Johnson's home must be suppressed.

## ARGUMENT

I.    **The district court erroneously denied Mr. Johnson's motion to suppress where the warrant to search his house relied on an unconstitutional warrantless search. Without the information from this warrantless search, the warrant does not provide probable cause to believe a crime was committed or that evidence of a crime would be found in Mr. Johnson's home.**

A.    **Standard of review.**

"In considering the denial of a motion to suppress," this Court

reviews "the district court's factual findings for clear error and its legal

conclusions de novo." *United States v. Wurie*, 728 F.3d 1, 2-3 (1st Cir. 2013),

*aff'd by Riley v. California*, 573 U.S. 373 (2014). This argument was preserved.

It was raised in a timely-filed motion and was the subject of a two-day

hearing. JA.I 25-49; JA.II 519-746. Mr. Johnson's plea agreement reserved

his right to appeal the denial of this motion. JA.II 796-803.

## B. General Fourth Amendment principles.

"The Fourth Amendment protects '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures….'" *Wurie*, 728 F.3d at 3 (quoting U.S. Const. amend. IV). The "basic guideposts" of the Fourth Amendment are to "secure 'the privacies of life' against 'arbitrary power'" and "to place obstacles in the way of a too permeating police surveillance." *Carpenter v. United States*, 585 U.S. 296, 305 (2018) (quoting *Boyd v. United States*, 116 U.S. 616, 630 (1886) and *United States v. Di Re*, 332 U.S. 581, 595 (1948)). The Supreme Court has directed courts to keep "this attention to Founding-era understandings in mind when applying the Fourth Amendment to innovations in surveillance tools." *Id*. at 305 (citing *Kyllo v. United States*, 553 U.S. 27, 34 (2001)).

There are two tests to determine whether a search has occurred. *See United States v. Bain*, 874 F.3d 1, 11-12 (1st Cir. 2017). "A search occurs whenever the government intrudes upon any place in which a person has a 'reasonable expectation of privacy.'" *Id.* (quoting *Katz v. United States*, 389 U.S. 347, 360 (1967) (Harlan, J., concurring)). "There are two steps involved in applying this test": whether the individual had a subjective expectation of privacy, or sought to keep something private; and whether society

recognizes this subjective expectation of privacy as reasonable. *Id.* (citing *Bond v. United States*, 529 U.S. 334, 338 (2000)); *see also Smith v. Maryland*, 442 U.S. 735, 740 (1979). "[W]hat [one] seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected." *Carpenter*, 585 U.S. at 310 (quoting *Katz*, 389 U.S. at 360-61 (Harlan, J. concurring)). The second test is the "common-law trespassory test" under which a search occurs when the government physically intrudes into a protected area. *Bain*, 874 F.3d at 12 (citing *Florida v. Jardines*, 569 U.S. 1 (2013)).

"[A] warrantless search is *per se* unreasonable under the Fourth Amendment, unless one of 'a few specifically established and well-delineated exceptions' applies.'" *Wurie*, 728 F.3d at 3 (quoting *Arizona v. Gant*, 556 U.S. 332, 338 (2009)). None of these exceptions applies here.[10]

"[W]hen faced with a warrant containing information obtained pursuant to

---

[10] The government did not argue that any of these exceptions applied. JA.II 415-39. Nor could it. The Supreme Court has long recognized that search incident to arrest, exigency, and consent are unlikely to apply in cases involving electronic surveillance. *Katz*, 389 U.S. at 357-58. The government's surveillance of Freenet took place months before Mr. Johnson's arrest. There was no suggestion that any exigency prevented law enforcement from getting a warrant before searching Freenet. Mr. Johnson was not asked to consent and did not consent to the surveillance of Freenet. Because the district court concluded that the surveillance of Freenet was not a search, it did not reach this issue. Add. 1-5.

an illegal search, a reviewing court must excise the offending information and evaluate whether what remains is sufficient to establish probable cause." *United States v. Dessesaure*, 429 F.3d 359, 367 (1st Cir. 2005). "A finding of probable cause 'demands proof sufficient to support a fair probability that a crime has been committed and that evidence of that crime is likely to be found within the objects to be searched.'" *United States v. Sheehan*, 70 F.4th 36, 44 (1st Cir. 2023) (quoting *United States v. Coombs*, 857 F.3d 439, 446 (1st Cir. 2017)).

### C. Mr. Johnson had a reasonable expectation of privacy in his activities on Freenet, making the government's use of modified Freenet a warrantless search that violated his Fourth Amendment rights.

In determining whether Mr. Johnson had a reasonable expectation of privacy, "it is important to begin by specifying precisely the nature of the state activity that is challenged." *Smith*, 442 U.S. at 741. Modified Freenet recorded and analyzed a large amount of data and applied a sophisticated mathematical formula to defeat the privacy and anonymity protecting features inherent in Freenet. *Pobre*, 2022 WL 1136891, at *2-*3; J.A.I 258-81. Mr. Johnson may have known that his IP address would be available to other Freenet users. He may have known that users could see the hash

values of any file blocks his Freenet node requested (whether he originally requested those blocks or not). But he could not have known that the government was monitoring Freenet traffic over a period of years using a proprietary computer program and mathematical formula developed to determine whether a particular user was the original requester of a block and whether the hash value of that block matched a database of CSAM the government had amassed. *See Carpenter*, 585 U.S. at 310-11; *United States v. Jones*, 565 U.S. 400, 416 (2012) (Sotomayor, J., concurring) (discussing government's potential "unrestrained power to assemble data"); *see also United States v. Moore-Bush*, 36 F.4th 320, 325 (1st Cir. 2022) (en banc) (Barron, C.J., concurring).

Mr. Johnson "exhibited an actual (subjective expectation of privacy)" in the sum of his movements through and conduct on Freenet. *Katz*, 389 U.S. at 361 (Harlan, J., concurrence). He used Freenet because he sought to keep his activities—the files he requested and their content—private. *See Id.* at 351; *United States v. Taylor*, 935 F.3d 1279, 1284 n.4 (11th Cir. 2019) ("Instead of traveling along the equivalent of 'public highways' (by browsing the open internet) or leaving the equivalent of a calling card at each website visited (as with a normal internet search), Tor users

purposefully shroud their browsing, such that they have a reasonable expectation of privacy in their online 'movements.'"). He chose to use Freenet despite its inconveniences: Freenet users can only access information users put on Freenet; there is no "searchable index of Freenet and its contents;" downloading files is extremely slow; and downloads do not always work. *See* JA.II 564, 567, 576-78, 615-16, 671. *Contrast Harper v. Werfel*, 118 F.4th 100, 110 (1st Cir. 2024) (noting that user chose convenient Bitcoin transactions rather than more private transactions that "require specialized software and greater technical proficiency").

Freenet advertises itself as "a peer-to-peer platform for censorship-resistant communication and publishing" that permits users to "[b]rowse websites, post on forms, and publish files within Freenet with strong privacy protections." JA.II 747; *see also* JA.II 675 (Freenet "labels itself as a privacy enhancing platform"); *Pobre*, 2022 WL 1136891 at *1 ("Freenet is an open source publicly available software network specifically designed to mask users' online identities."); JA.II 499-500. Dr. Levine explained that Freenet tries to provide "anonymity" for its users by making it "difficult to attribute some action on the network to a particular IP address." JA.II 546, 499-500. Although he opined that Freenet does not always deliver on these

promises, he recognized that Freenet "tries not to allow what you're doing to be attributed to you" and does so "successfully for any single request." JA.II 597; *see also* JA.II 675 ("some of the requests are private, any one singular particular request is private"); JA.I 94-95.

Mr. Johnson derived a reasonable expectation of privacy from the way that Freenet works. Typically, Freenet users are unaware that their computer has received, fulfilled, or relayed a block request from another user. *United States v Sigouin*, 494 F.Supp.3d 1252, 1259 (S.D. Fla. 2019) ("For each iteration, the Network's software forwards the requests and/or returns the blocks automatically, without the knowledge of the owners of the non-requesting nodes."); *United States v. Dickerman*, 954 F.3d 1060, 1063 (8th Cir. 2020) ("Requesters know what file they are requesting; relayers do not know what blocks have been requested from their computers or what file those blocks are part of. Relayers do not even know whether their computers have relayed an original request for blocks to their peers."). Dr. Levine acknowledged that finding the necessary information without modified Freenet would be unwieldy, prone to error, and take a long time. *See infra* p.20-21; *see also See Carpenter*, 585 U.S. at 310-11; *Jones*, 565 U.S. at 416 (Sotomayor, J., concurring). Non-law-enforcement Freenet users

generally lack the information and tools necessary to analyze whether a particular user originated or relayed a block request. *See infra* p.20-21. It is only with advanced technology, modified Freenet, a mathematic formula, and an extensive database of files that law enforcement can gather and analyze the data necessary to break Freenet's anonymity. *See Kyllo*, 533 U.S. at 34-35.

Mr. Johnson chose to use a program that advertises anonymity and privacy protections. *Contrast United States v. Morel*, 922 F.3d 1, 10 (1st Cir. 2019) ("Morel chose to upload the images to a website that makes it 'impossible' to prevent third parties from accessing the images…. Morel did not choose one of the more private website alternatives which exist."). He chose to use a program that enabled him to request files by sharing limited information and without identifying the content of those files. *Sigouin*, 494 F.Supp.3d at 1265 ("Mr. Sigouin voluntarily shared the alphanumeric hash value of a block. That hash value communicates nothing about the content of the underlying file; it also communicates nothing else about the sender, other than perhaps the sender's desire to get a copy of the corresponding block."). Using Freenet gave him a reasonable

expectation that the sum of his activities, particularly his identity as the requester of the content of any particular file, would remain private.

The fact that researchers devised a program and mathematical formula that enable the government to defeat Freenet's protections does not make Mr. Johnson's expectation of privacy unreasonable. The government investigated Freenet users before Dr. Levine's team developed modified Freenet. Before this research, law enforcement "found it difficult to conduct investigations." JA.II 594. Modified Freenet is "not in general public use," making Mr. Johnson's expectation of privacy more reasonable. *Kyllo*, 533 U.S. at 34-35.

Nor did Freenet's warnings that anonymity may not be perfect defeat a reasonable expectation of privacy. During the download process, prospective users are told that Freenet performs best in opennet mode, but that "[i]t may be quite easy for others to discover your identity." JA.II 756; *see also Pobre*, 2022 WL 1136891 at *2 ("This is because nodes that connect in opennet can obtain the IP addresses of its first level peers and other related information such as how long the node has been connected to Freenet, how many peers are connected to the node, and the geographic location of the node."). This warning does not alert users that someone might be able to

uncover their identity as the requester of a particular file or the content of that file; it informs them that their IP address will be revealed. During installation, Freenet advises that although it "is much safer than traditional P2P software like BitTorrent or Gnutella,…an attacker with moderate resources may be able to trace your activity on Freenet back to you." JA.II 755; *see also* JA.II 554, 559-60. It took substantial energy, research, and resources to develop and deploy modified Freenet. JA.I 258-81; JA.II 679-83. It was reasonable for Mr. Johnson to expect that no single user would or could devote this amount of energy to developing a mathematical formula, modifying Freenet, and collecting the data necessary to determine the content of the files for the blocks he requested.

Nor does the fact that the information gathered by modified Freenet might be available to all users defeat Mr. Johnson's expectation of privacy. Dr. Levine testified that users could access all the information modified Freenet collects by putting their program in "debug mode." JA.II 580-86, 618-24, 716-17. The district court did not make any findings about what debug mode is, how it works, what it collects, or how it impacts the Fourth Amendment analysis. Add. 1-5. The images the government introduced showing how Freenet works do not show "debug mode" as an option. JA.II

747-66. 1. Dr. Levine did not testify about how debug mode is accessed, what information it provides, or what that information looks like. JA.II 580-86, 618-24, 716-17; *see also* JA.II 621 (noting he had not "looked at" debug logs "in a long time"). Dr. Levine opined that "I think by eye it's too hard to look through the debug log. It would take a lot of time." JA.II 581; *see also* JA.II 716-17. He said that the log was "meant to be read by a user who is a developer." JA.II 621. Modified Freenet, in contrast, works automatically and instantaneously. JA.II 648-50, 657-58; *see also Carpenter*, 585 U.S. at 309 (noting that data collected was "detailed, encyclopedic and effortlessly compiled"). Dr. Levine previously said that while debug mode is available, he did not "think most users use" it. JA.I 145; *see also Sigouin*, 494 F.Supp.3d at 1259; *Dickerman*, 954 F.3d at 1063. Nor is debug mode alone enough; the government also needed a database of hash values of blocks containing CSAM. JA.II 621-23. It was reasonable for Mr. Johnson to believe that no single user would locate this mode, learn to decipher the log, carefully cull the correct information from it, develop the necessary mathematical formula, and create the database of files necessary to pierce Freenet's privacy protections.

Mr. Johnson's expectation of privacy is one that society is prepared to recognize as reasonable. As the world becomes increasingly digital, people have as much of a privacy interest in their movements online as in their physical movements. In the past, physical movements might reveal "'familial, political, professional, religious, and sexual associations.'" *Carpenter*, 585 U.S. at 311 (quoting *Jones*, 565 U.S. at 415 (Sotomayor, J., concurrence). Now those associations are as likely to be revealed through surveillance of online movements. *See Jones*, 565 U.S. at 417 (Sotomayor, J., concurring) (noting that in "digital age," "people reveal a great deal of information about themselves to third parties in the course of carrying out mundane tasks."); *Carpenter*, 585 U.S. at 387 (Gorsuch, J., dissenting) ("Even our most private documents—those that, in other eras, we would have locked safely in a desk drawer or destroyed—now reside on third party servers."). Internet surveillance will often reveal the intimate details of what happens in the home, the very core of Fourth Amendment protection. Nor is it easy to avoid using the internet; almost all of daily life involves the internet. *See Carpenter*, 585 U.S. at 315 (noting there was no way, apart from not using a cellphone, to avoid leaving cellphone location information); *Moore-Bush*, 36 F.4th at 347 ("Thus, the only countermeasures

certain to work—never leaving the house or enclosing the curtilage to make it effectively part of the inside of the house—are at least as unreasonable to expect a person to take as leaving home without a cell phone.").

However, as the internet is a global network of linked computing devices, there is essentially no fully "private" way to use it. Dr. Levine testified that it is "difficult to provide anonymity on the internet." JA.II 593. This is in part because "[b]y virtue of using the internet, if you expect a reply, which you always do on the internet, just like a letter in the post office, you have to include your IP address in order to get a response." JA.II 557; *see also* JA.II 562 (noting that private browsers still send your IP address to websites, they just do not store that information on your computer); JA.II 670 (describing IP address sharing as "just part of the internet communications"); *Carpenter*, 585 U.S. at 315 (noting that cellphone users did not "voluntarily" "share" data gathered by government).

The Fourth Amendment must evolve along with technology. *See United States v. Tuggle*, 4 F.4th 505, 527-28 (4th Cir. 2021) ("If anything, we should expect technology to continue to grow exponentially. And if current technologies are any indication, that technological growth will predictably

have an inverse and inimical relationship with individual privacy from

government intrusion, presenting serious concerns for Fourth Amendment

protections."); *see also Moore-Bush*, 36 F.4th at 348. Members of modern

society would likely understand that things they send on the internet are

shared. However, they would not expect comprehensive monitoring and

analysis that would reveal all their private activities to the government.

This expectation of privacy is all the more reasonable where the person

chose to conduct those activities on an internet platform dedicated to

preventing censorship and providing privacy and anonymity.

     i.     *The third-party doctrine is not to the contrary.*

One of the general principles of Fourth Amendment law is that

people do not have a reasonable expectation of privacy in things that they

knowingly expose to the public. *See Katz*, 389 U.S. at 351. This principle is

limited: what someone "seeks to preserve as private, even in an area

accessible to the public, may be constitutionally protected." *Id.* Applying

the general principle, the Supreme Court has held that "the Fourth

Amendment does not prohibit the obtaining of information revealed to a

third party and conveyed by him to Government authorities, even if the

information is revealed on the assumption that it will be used only for a

limited purpose and the confidence placed in the third party will not be betrayed." *United States v. Miller*, 425 U.S. 435, 443 (1976). This principle permits the government to subpoena records from banks, internet service providers, phone companies, and other businesses without a warrant. *See id.* at 441.

The third-party doctrine does not apply to this case. The government did not seek business records from a third party; it did not ask Freenet for anything. Freenet was not cataloging and storing the information the government needed to defeat its privacy protections. *Contrast id*. at 440-41. Courts have found that requesting subscriber information from peer-to-peer networks is not a search because subscribers voluntarily disclose this information to the network. *See United States v. Trader*, 981 F.3d 961, 967-68 (11th Cir. 2020). Mr. Johnson did not voluntarily disclose all the information required to unmask Freenet's privacy protections. *Contrast United States v. Gratkowski*, 964 F.3d 307, 312-13 (5th Cir. 2020) (finding no reasonable expectation of privacy in Bitcoin transactions where "it is well known that each Bitcoin transaction is recorded in a publicly available blockchain" and government analyzed that blockchain); *Harper*, 118 F.4th at 107-09 (finding no reasonable expectation of privacy where users

"transmit financial information to the public—even pseudonymously").

Instead, the government investigated Freenet users by compiling and

analyzing data it created. *See Moore-Bush*, 36 F.4th at 344 (distinguishing

government accessing information it "created through its own

surveillance" from government accessing "information that it had

requested from a third-party to which that collection of information had

already been disclosed").

Even if the third-party doctrine has some relevance, it should not

apply when the government conducts extensive surveillance using

advanced technology. *See Carpenter*, 585 U.S. 309-10; *Jones*, 565 U.S. at 417

(Sotomayor, J., concurring); *Kyllo*, 533 U.S. at 35; *United States v. Moalin*, 973

F.3d 977, 990 (9th Cir. 2020) ("Confronting these changes, and recognizing

that a 'central aim' of the Fourth Amendment was 'to place obstacles in the

way of a too permeating police surveillance,' the Supreme Court recently

declined to 'extend' the third-party doctrine to information whose

collection was enabled by new technology." (quoting *Carpenter*, 585 U.S. at

305, 309-10)). Applying the third-party doctrine as technology advances

would have serious consequences:

> Although the *Smith* Court perceived a significant distinction between the "contents" of a conversation and the phone number dialed, *see* 442 U.S. at 743, in recent years the distinction between content and metadata "has become increasingly untenable," as Amici point out. Br. of Amici Curiae Brennan Center for Justice 6. The amount of metadata created and collected has increased exponentially, along with the government's ability to analyze it. "Records that once would have revealed a few scattered tiles of information about a person now reveal an entire mosaic—a vibrant and constantly updating picture of the person's life." *Klayman v. Obama*, 957 F. Supp. 2d 1, 36 (D.D.C. 2013), *vacated and remanded*, 800 F.3d 559 (D.C. Cir. 2015). According to the NSA's former general counsel Stewart Baker, "[m]etadata absolutely tells you everything about somebody's life….If you have enough metadata you don't really need content…." Laura K. Donohue, *The Future of Foreign Intelligence* 39 (2016). The information collected here was thus substantially more revealing than the telephone numbers recorded in *Smith*."

*Moalin*, at 991; *see also id.* at 992 ("Finally, numerous commentators and two Supreme Court Justices have questioned the continuing viability of the third-party doctrine under current societal realities."); *Jones*, 565 U.S. at 417 (Sotomayor, J., concurring) (noting assumption-of-risk rationale underlying third-party doctrine is "ill-suited to the digital age, in which people reveal a great deal of information about themselves to third parties in the course of carrying out mundane tasks"); *Carpenter*, 585 U.S. at 387 (Gorsuch, J., dissenting). The metadata collected by modified Freenet—specifically the hash values of requested encrypted blocks—*is* content. Using a large-scale dataset, the government unveils the content of the block request. As in

*Carpenter*, the information is "detailed, encyclopedic and effortlessly compiled." *Carpenter*, 585 U.S. at 309.

By using Freenet, Mr. Johnson made limited disclosures to other users—his node asked other nodes for blocks of an unidentifiable file. JA.II 555-58. There was no central repository of all the information the government needed to uncover the content of the file and Mr. Johnson's anonymity. The government needed a sophisticated computer program, a mathematical formula, and a large database of files to pierce Freenet's privacy protections. *See Carpenter*, 585 U.S. at 310-11 (holding that CSLI "contravene[d]" "society's expectations" that law enforcement "would not . . . secretly monitor and catalogue every single movement . . . for a very long period"). Mr. Johnson disclosed his IP address and the hash value of the block he was seeking, but the government needed more. Mr. Johnson did not knowingly disclose to a third party all the information needed to determine that he requested a particular file or its contents. The government's surveillance of Freenet was a warrantless search that violated Mr. Johnson's reasonable expectation of privacy.

*ii.*   *Cases involving undercover officers are not to the contrary.*

The Supreme Court has held that the Fourth Amendment does not protect "a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it." *Hoffa v. United States*, 385 U.S. 293, 301 (1966); *see also Pagán-González v. Moreno*, 919 F.3d 582, 592-93 (1st Cir. 2019). The district court wrote that Mr. Johnson did not have a reasonable expectation of privacy in his activities on Freenet in part because "in using Freenet Roundup, the agents 'act[] like an undercover officer crashing a public meeting.'" Add.5 (quoting *Pobre*, 2022 WL 1136891 at *6). This analogy is inapt, as are cases concerning undercover officers. This case is not about whether Mr. Johnson mistakenly trusted other Freenet users—it is about whether Mr. Johnson's use of Freenet gave him a reasonable expectation of privacy.

In *Hoffa*, the appellants argued that evidence obtained by an undercover informant had to be suppressed. 385 U.S. at 295-301. The Court noted that the Fourth Amendment protects "the security a man relies upon when he places himself or his property within a constitutionally protected area," including when he "puts something in his filing cabinet, in his desk drawer, or in his pocket." 385 U.S. at 301. It held that the Fourth

Amendment did not apply to the government's conduct because the defendant "was not relying on the security of his hotel suite when he made the incriminating statements to [the informant] or in [the informant's] presence" and "was not relying on the security of the hotel room; he was relying upon his misplaced confidence that [the informant] would not reveal his wrongdoing." *Hoffa*, at 302; *see also Lewis v. United States*, 385 U.S. 206, 210 (1966) ("During neither of his visits to petitioner's home did the agent see, hear, or take anything that was not contemplated, and in fact intended, by petitioner as a necessary part of his illegal business.").

Mr. Johnson relied on the privacy-protection of Freenet, not on his confidence in other Freenet users. He did not announce on Freenet, or anywhere else, that he was seeking or downloading a file containing CSAM. He used a program that split his file search into multiple requests for pieces of a file that would be divided among a multitude of users. Those users did not know what any particular block or file contained, and nothing about Mr. Johnson's requests identified to other users what they were. *See Sigouin*, 494 F.Supp.3d at 1259; *Dickerman*, 954 F.3d at 1063. He did not give any normal user enough information to implicate him in a crime or provide probable cause for a warrant. The only way the content of

the files comprised by the blocks and the identity of the original requester

could be revealed was through the government's pervasive surveillance,

data collection, and use of modified Freenet.

   iii.   Moore-Bush *is not to the contrary.*

Two of the cases cited above, *Moore-Bush* and *Tuggle*, involved long-

term, pole-camera-based surveillance of homes. *Moore-Bush*, 36 F.4th at 323;

*Tuggle* 4 F.4th at 511-12. These cases do not suggest that the warrantless

surveillance of Freenet was permissible. In *Moore-Bush*, law-enforcement

officers operated a pole camera outside a home for eight months. 36 F.4th

at 322-23. At the time of the surveillance, First-Circuit precedent held that

eight-month video surveillance of a home was not a Fourth Amendment

search. *See United States v. Bucci*, 582 F.3d 108, 116-17 (1st Cir. 2009). The en

banc court determined that suppression was not necessary, but divided

evenly as to the reason for that result. *Moore-Bush*, 36 F.4th at 321-22. Half

of this Court would have reversed *Bucci* and held that "all-encompassing,

long-term video surveillance of the front curtilage of a home" was a Fourth

Amendment search. *Id.* These judges held that suppression was not

required because the officers relied on *Bucci* in good faith. *Id.* at 321. The

other three judges would have held that the pole-camera surveillance did

not violate the Fourth Amendment because it was "the use of long-used, widely-available technology that detects only what is plainly in the public view." *Id.* at 373. In *Tuggle*, the Seventh Circuit held that it was bound to conclude that "the government's use of a technology in public use, while occupying a place it was lawfully entitled to be, to observe plainly visible happenings, did not run afoul of the Fourth Amendment." *Tuggle*, 4 F.4th at 511. The Court expressed concern about the expansion of technology and its implications for the protections of the Fourth Amendment. *Id.* at 527-29.

Neither of these cases, or other pole-camera cases, suggests that the technological surveillance undertaken here was not a search. Unlike pole cameras, modified Freenet is not a common or publicly-available technology. Modified Freenet was developed by researchers to help law enforcement investigate in a forum where traditional policework was too difficult. JA.II 594; JA.I 258, 269, 274-75, 281. It is only available to law-enforcement officers who have been trained to use it. JA.II 454-55. Unlike a pole camera, it uncovers things that are not plainly visible. Freenet users reveal their IP addresses, but they conceal whether they originated a particular request and the contents of the requested file. The fact that academics developed a technology and formula to pierce this privacy does

not mean that the information was publicly available. Mr. Johnson used a program dedicated to protecting privacy, and the government collected and analyzed data to defeat those protections. Mr. Johnson had a reasonable expectation of privacy in the sum of his activities on Freenet.

> iv. *Cases involving other peer-to-peer programs are inapplicable because Freenet operates in a meaningfully different way.*

The district court erroneously concluded that "cases rejecting similar challenges to traditional peer-to-peer networks" were persuasive even as it recognized that "Freenet is a different type of peer-to-peer network." Add. 5. Freenet is meaningfully different from other peer-to-peer programs, and the cases involving the other programs are not relevant to this analysis. The purpose of most peer-to-peer platforms is to share entire files. *See, e.g., United States v. Ganoe*, 538 F.3d 1117, 1119 (9th Cir. 2008) (describing LimeWire); *United States v. Stults*, 575 F.3d 834 (8th Cir. 2009); *United States v. Weast*, 811 F.3d 743 (5th Cir. 2016); *United States v. Arumugam*, 2020 WL 1154651, at *1 (W.D. Wash.) (describing eMule); *United States v. Thompson*, 2023 WL 424212, at *3-*4 (D.N.Dak.) (describing Snapchat); *United States v. Shipton*, 2019 WL 5330928, at *2-*3 (D.Minn.) (describing Gnutella). Users make files available in exchange for other users sharing their files. Freenet

ensures that no user stores an individual file. *See Pobre*, 2022 WL 1136891 at *2 ("Freenet, however, configures and stores the content in such a way that no single computer can be said to 'possess' any given file, thus making it difficult to associate any one file with one IP address."); JA.II 671-75. Further, "unlike conventional peer-to-peer file sharing networks, Freenet was designed with the express purpose of protecting user anonymity." *United States v. Dickerman*, 2017 WL 11485604 (ED. Mo.); *see also* JA.II 499-500, 514 (noting that Freenet was designed for anonymity and that its users are often "paranoid").

Users of traditional peer-to-peer networks do not have a reasonable expectation of privacy because they have "opened" their computer or files "to the world." *Ganoe*, 538 F.3d at 1127; *State v. Zuck*, 2021 WL 2103598, at *8 (Ct. App. Ariz); *Arumugam*, 2020 WL 1154651, at *3-*4 (considering widespread surveillance of eMule but finding no reasonable expectation of privacy in files defendant "chose to upload to his eMule 'shared' folder for public download"); *Thompson*, 2023 WL 424212 at *4 (applying rule that "defendant has no objectively reasonable expectation of privacy in files he shares on a public network or in an online space accessible by the public" to images publicly shared on Snapchat); *Shipton*, 2019 WL 5330928 at *14

("The peer-to-peer file sharer plainly assumes the risk that anyone using the software could see the files she is sharing…."). Freenet is different; its users do not open their computers or files. The only things accessible to other Freenet users are encrypted blocks of files that users cannot open or identify. JA.II 673-75. Where traditional peer-to-peer programs rely on file sharing, Freenet relies on storage-space sharing. Freenet users do not make files public in a way that defeats a reasonable expectation of privacy.

Some peer-to-peer programs inform users that their conduct and content will be monitored, recorded, and/or sent to law enforcement. *See United States v. DiTomasso*, 56 F.Supp.3d 584, 588-89 (S.D.N.Y. 2014) (analyzing Omegle and AOL privacy policies). Other peer-to-peer networks have a "declared ethos" of "sharing, not anonymity." *United States v. Carme*, 2020 WL 3270877 (D.Mass.) (describing BitTorrent, which expects users to reveal their IP addresses and to permit other users to access any files they obtain). Agreeing to use a program that explicitly warns that it is monitored  or based on sharing may diminish a person's expectation of privacy. Freenet, however, advertised itself as a service that was meant to resist censorship, to ensure the availability of all content, and to protect user privacy. JA.II 747; *see also* JA.I 499-500; JA.II 675; *Pobre*, 2022

WL 1136891 at *1. This message, the opposite of a statement warning of monitoring, contributed to Mr. Johnson's reasonable expectation of privacy.

### D. The government's actions constituted an unconstitutional warrantless search.

Mr. Johnson used a peer-to-peer program that was designed to be censorship-resistant and to protect privacy and anonymity. JA.II 747; *see also* JA.I 499-500; JA.II 675; *Pobre*, 2022 WL 1136891 at *1. Neither he, nor any other user, shared any particular file for download by others. When he made requests on Freenet, he shared his IP address and a hash value for a particular block he was seeking. He did not share the content of this block or whether he was the original requester of that block. Even to the extent portions of his conduct were exposed to the public, the government needed extensive surveillance, a specially-developed computer program, an advanced mathematical formula, and a database of hash values to connect his IP address to the content of the file associated with an original block request. Without these tools, the government had a hard time investigating Freenet. JA.II 594; *see also* JA.I 258, 269, 274-75, 281. It was reasonable for Mr. Johnson to believe that no user would or could devote this level of

energy and expertise to piercing Freenet's protections. Under *Katz,*
*Carpenter, Kyllo*, and the other cases discussed herein, the use of modified
Freenet to surveil and analyze Freenet traffic was a Fourth Amendment
search. The district court erred by deciding to the contrary, and its opinion
must be reversed.

### E. The good-faith exception does not apply.

"Evidence obtained during a search conducted in reasonable reliance
on binding precedent is not subject to the exclusionary rule." *Davis v.*
*United States*, 564 U.S. 229, 241 (2011); *see also Moore-Bush*, 36 F.4th at 328.
"The government bears the burden of showing that its officers acted with
objective good faith." *United States v. Brunette*, 256 F.3d 14, 17 (1st Cir.
2001). The government did not argue below that the good-faith exception
applies to excuse the warrantless search of Freenet. JA.II 415-39. Nor did it
identify any binding precedent requiring the district court to rule in any
particular way. *Id*. The question of whether the government's surveillance,
through modified Freenet, is a Fourth Amendment search, was an open
question in the First Circuit at the time of this search. The government was
not reasonably relying on binding precedent at the time it used modified

Freenet to track Mr. Johnson's Freenet conduct. This unconstitutional search is not saved by the good-faith exception.

The government argued that suppression was not required because suppression is not the remedy for an Electronic Communications Privacy Act (ECPA) violation under 18 U.S.C. §2708. JA.II 427. Mr. Johnson does not argue that the government's conduct violated the ECPA. He argues that it violated the Fourth Amendment of the Constitution. JA.I 25-49. The remedy for a violation of the Fourth Amendment is suppression. *See, e.g.,* *Brunette*, 256 F.3d at 19.

**F.** **The warrant to search Mr. Johnson's home depended on information gleaned from the unconstitutional warrantless search of Freenet. When this information is removed from the warrant application, there is no probable cause, and the fruits of the warrant must be suppressed.**

The warrant to search Mr. Johnson's home depended on information the government learned from the unconstitutional, warrantless search of Freenet. JA.I 51-62. "[W]hen faced with a warrant containing information obtained pursuant to an illegal search, a reviewing court must excise the offending information and evaluate whether what remains is sufficient to establish probable cause." *Dessesaure*, 429 F.3d at 367. "A finding of probable cause 'demands proof sufficient to support a fair probability that

38

a crime has been committed and that evidence of that crime is likely to be found within the objects to be searched.'" *Sheehan*, 70 F.4th at 44 (quoting *Coombs*, 857 F.3d at 446).

Without the information gleaned from Freenet, the warrant application provides no probable cause to believe that a crime had been committed or that evidence of that crime would be found at Mr. Johnson's house. The only evidence of a crime that the application describes is that Mr. Johnson may have downloaded files containing child pornography from Freenet. JA.I 59-62. Without this information, the warrant contains no basis to believe that Mr. Johnson committed a crime. Mr. Johnson made this argument in his motion to suppress. JA.I 25, 48-49. The government did not make any counterargument or assert that the warrant provided probable cause without the information from Freenet. JA.II 415-39.

Stripped of the unlawfully obtained information, the warrant application is obviously insufficient. Accordingly, all the fruits of the warrant to search Mr. Johnson's house must be suppressed. *Wong Sun v. United States*, 371 U.S. 471 (1963).

## CONCLUSION

For the foregoing reasons, Mr. Johnson asks this Court to vacate his

conviction and the district court's order denying his motion to suppress

and to remand with instructions to grant his motion to suppress.

Respectfully Submitted,

*/s/ Christine DeMaso*

Christine DeMaso
Assistant Federal Public Defender
51 Sleeper St.—5th Floor
Boston, MA 02210
(617) 223-8061
Identification No. 1168061

Dated: January 24, 2025

**CERTIFICATE OF COMPLIANCE WITH RULE 32(A)**

Certificate of Compliance With Type-Volume Limitation, Typeface
Requirements, and Type Style Requirements

1.     This brief complies with the type-volume limitation of Fed. R. App. P.
       32(a)(7)(B) because:

              this brief contains 8,219 words, excluding the parts of the brief
              exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed. R. App. P.
       32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6)
       because:

              this brief has been prepared in a proportionally spaced typeface
              using Microsoft Word and 14-point Book Antiqua font.

                            */s/ Christine DeMaso*
                            Christine DeMaso

                            Attorney for Eric R. Johnson

                            Dated: January 24, 2025

## CERTIFICATE OF SERVICE

I, Christine DeMaso, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants, including all counsel of record, specifically, Donald Campbell Lockhart, as identified on the Notice of Electronic Filing on January 24, 2025.

*/s/ Christine DeMaso*
Christine DeMaso

# ADDENDUM

# TABLE OF CONTENTS

Ruling on Motion to Suppress (D.E. 116) ...................................................Add. 1

Judgment .......................................................................................................Add. 6

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                         )
                                         )
UNITED STATES OF AMERICA,                )
                                         )
                                         )
        v.                               )        Criminal No. 22-cr-10066-DJC-1
                                         )
                                         )
ERIC ROBERT JOHNSON                      )
                                         )
        Defendant.                       )
                                         )
_____          )

## RULING ON MOTION TO SUPPRESS

CASPER, J.                                                       January 7, 2024

*Introduction.*  Having had the opportunity to review and consider the motion to suppress

filed by Defendant Eric Robert Johnson ("Johnson"), D. 101, the government's opposition to the

same, D. 107, Johnson's reply, D. 109, and the testimony and exhibits offered over two days of

evidentiary hearings that began on December 1, 2023 and concluded on January 5, 2024, D. 110,

115, the Court wants to give the parties the benefit of its ruling now given the upcoming trial set

to begin on January 29, 2024.  Johnson seeks to suppress all information obtained regarding his IP

address and other evidence seized through law enforcement's use of Freenet Roundup, a law

enforcement version of Freenet, on the grounds that such conduct constituted an unreasonable

search and seizure in violation of the Fourth Amendment.  For the reasons explained herein, the

Court DENIES the motion.

*Findings of Fact.*  The Court bases these findings of fact on the testimony of Dr. Brian

Levine and exhibits, Exh. 1-11, admitted in the course of the evidentiary hearing.  Freenet is a

peer-to-peer network that allows users to share files.  Unlike traditional peer-to-peer networks,

Freenet does not involve direct file sharing between users, but involves a system intended to be "censorship resistant" and make the identity of users more difficult to ascertain. It does so by breaking any file to be shared into blocks and encrypting each block. Those blocks are then distributed and stored randomly across Freenet's network of peers. The program creates an index that contains the list of all of the blocks of the file and a unique "manifest key" is needed to retrieve the blocks and reconstruct the file. When a user seeks to retrieve a file, the user sends a request to neighboring "nodes" (peers on Freenet) to retrieve the necessary blocks. If neighboring nodes do not have the blocks, the request gets passed on (or relayed) to other nodes. Freenet attempts to conceal the identity of the original requestor by randomizing the number of times a request can be forwarded from peer to peer to no more than 18 times (i.e., as discussed below, 18 "hops"). Freenet software is free and publicly available and a user can freely download it. When doing so, a user can select to use Freenet in "Darknet' or Opennet" mode. In the former, a user would connect only with peers selected by the user. In Opennet mode, a user would be connected any other user, including those unknown to the user who will have access to, among other things, the user's IP address. Such strangers could include law enforcement officers. Freenet warns users about the limits of security and anonymity during the installation process. Exh. 1 at USAO_000911 (as to low security mode, warning that "an attacker with moderate resources may be able to trace your activity on Freenet back to you"); id. at 00912 (describing Opennet mode as "connect[ing] to strangers and friends" and it "may be quite easy for others to discovery your identity"); id. at USAO_000912, 917 (indicating that security level is "LOW" when using Freenet in Opennet mode). Freenet is a slower and less efficient way of sharing and downloading images and its other features made it an attractive program for sharing contraband, including child sexual abuse

material ("CSAM").  Dr. Levine's 2020 study, Exh. 3, found that "at least 30% of request traffic on Freenet is for CSAM-related content."

The one witness at the evidentiary hearing was Dr. Levine, a professor at the University of Massachusetts with a PhD in computer engineering and his research focuses on security and networking including but not limited to peer-to-peer networking.  Exh. 9.  Dr. Levine and his team created Freenet Roundup as a law enforcement officer ("LEO") tool in the investigation of CSAM.  It is a modification of the publicly available Freenet and it operates on the Opennet mode.  The LEO nodes constitute only about 1% of all of the nodes on Freenet (at least as of 2018, Exh. 11) and they do not search for any particular user, IP address and do not search an user's computer.  Instead, Freenet Roundup works on two levels of filtering.  First, at the LEO node level, it is filtering the "Hops to Live" (i.e., "a counter to prevent block requests from propagating indefinitely," Exh. 3 at USAO_000411) to those that are above 16 hops.  For mathematical reasons explored and thoroughly explained by Dr. Levine, Exh. 3, this first level of filtering helps to narrow the field of determining that a particular node is more likely a requestor node (that is, the downloader or uploader of a file) as opposed to a relayer node (that is, simply forwarding requests from others).  This approach, again for reasons thoroughly explained in Dr. Levine's papers, Exh. 2-3, has a very low false positive rate.  The second level of filtering is the ICAC Cops filtering level where the hash values of the block requests are compared against a database of known blocks of CSAM.  If there is a match, the blocks are logged and LEO can pass these leads regarding CSAM on to law enforcement in the appropriate jurisdiction, based upon geolocations for IP addresses, for further investigation.

The LEO version of Freenet is not publicly available (although Dr. Levine's papers explaining same, Exhs. 2-3, are publicly available) and only trained LEOs can use it.  FBI Special

Agent Bryce Montoya received such Freenet training, Exh. 7, and was the investigator in this case. Montoya received and reviewed information that a user with the IP address (later identified as Johnson's) had requested blocks of CSAM on Freenet (through the process explained above). Exh. 8 at 10-12. This user was using Freenet in Opennet mode which is where LEO nodes were also present using Freenet Roundup. This IP address made requests for blocks of CSAM on three occasions, between May 29 and 30, 2021, June 3, 2021, and June 8, 2021. Id. A later subpoena to Verizon determined that Johnson was the subscriber for this IP address. Id. at 13. Agents received a search warrant for Johnson's residence for evidence, fruits and instrumentalities for possession and receipt of child pornography, Exh. 8. The search warrant was executed on February 23, 2022. D. 1-2 at 2. A search of his laptop revealed that it had Freenet software on it and at least one of his electronic devices contained child pornography, D. 1-2 at 2-4.

  *Conclusions of Law.* As a threshold matter, the parties dispute that Defendant had a reasonable expectation of privacy in his use of Freenet. The Fourth Amendment "protects persons from warrantless searches and seizures as to any place for which the person maintains a reasonable expectation of privacy." United States v. Pobre, No. 8:19-cr-348-PX, 2022 WL 1136891, at *4 (D. Md. Apr. 15, 2022) (citing Katz v. United States, 389 U.S. 347, 351 (1967)). The Court concludes that Johnson did not have a reasonable expectation of privacy in his use of Freenet and, accordingly, his Fourth Amendment challenge fails and the Court DENIES the motion to suppress. The Court disagrees with Johnson's counsel that the "narrow" scope of decision in Carpenter v. United States, ___ U.S. ___, 138 S. Ct. 2206, 2220 (2018) governs here. Unlike an individual "maintain[ing] a legitimate expectation of privacy in the record of his physical movements as captured through [cell-site location information]" in Carpenter, 138 S. Ct. at 2217, Johnson chose to participate in a peer-to-peer network designed to allow censorship-resistant communication and

4

**Add. 4**

with measures to protect anonymity, but that warned any user that his identification could be discovered and that the choice of Opennet will allow connections with strangers (which could or could not be law enforcement).  Exh. 1.  Johnson chose to use the Freenet platform and to use Opennet mode.  See Pobre, 2022 WL 1136891, at *4 (denying a motion to suppress evidence obtained through use of Freenet Roundup and distinguishing Carpenter and its progeny).  Moreover, unlike the wholesale cataloguing and disclosure of cell site location information in Carpenter, Carpenter, 138 S. Ct. 2216-20, the same is not true for Freenet Roundup, which essentially logs the block requests that are likely to contain suspected CSAM.  Although law enforcement was using a modified version of Freenet to do so, it was doing so in a forum where Johnson already has no reasonable expectation of privacy.  That is, in using Freenet Roundup, the agents "act[] like an undercover officer crashing a public meeting."  Pobre, 2022 WL 1136891, at *6.  Although Freenet is a different type of peer-to-peer network, the Court still finds cases rejecting similar challenges to traditional peer-to-peer networks persuasive, see D. 107 at 13 n.3 (and cases cited), and finds the analysis in Pobre denying a similar Fourth Amendment challenge to the use of Freenet Roundup particularly persuasive.

Conclusion.  For all of these reasons, the Court DENIES the motion to suppress, D. 101.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge

**Add. 5**

AO 245B (Rev. 11/16)   Judgment in a Criminal Case
                        Sheet 1

# UNITED STATES DISTRICT COURT

## District of Massachusetts

| | |
|---|---|
| UNITED STATES OF AMERICA | **JUDGMENT IN A CRIMINAL CASE** |
| **v.** | |
| ERIC ROBERT JOHNSON | Case Number: **1: 22 CR 10066 - 01 - DJC** |
| | USM Number: 87830-509 |
| | Forest J. O'Neill-Greenberg & Aziza Hawthorne |
| | Defendant's Attorney |

**THE DEFENDANT:**

☑ pleaded guilty to count(s)   1

☐ pleaded nolo contendere to count(s)
    which was accepted by the court.

☐ was found guilty on count(s)
    after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 USC §2252A(a)(5)(B) | Possession of Child Pornography | 02/23/22 | 1 |

The defendant is sentenced as provided in pages 2 through ___7___ of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s)

☐ Count(s)                      ☐ is   ☐ are dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

5/2/2024
Date of Imposition of Judgment

Signature of Judge

The Honorable Denise J. Casper
Judge, U.S. District Court
Name and Title of Judge

5/10/2024
Date

# Add. 6

AO 245B (Rev. 11/16)   Judgment in Criminal Case
Sheet 2 — Imprisonment

Judgment — Page    2    of    7

DEFENDANT: ERIC ROBERT JOHNSON
CASE NUMBER:   1: 22  CR  10066   - 01   - DJC

## IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:    120    month(s)

☑   The court makes the following recommendations to the Bureau of Prisons:

The defendant be designated to FMC Devens, or an institution, commensurate with security, where the defendant can participate in sex offender treatment.

☑   The defendant is remanded to the custody of the United States Marshal.

☐   The defendant shall surrender to the United States Marshal for this district:

    ☐   at   _____   ☐ a.m.   ☐ p.m.   on   _____ .

    ☐   as notified by the United States Marshal.

☐   The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☐   before 2 p.m. on   _____ .

    ☐   as notified by the United States Marshal.

    ☐   as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on   _____   to   _____

a _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

# Add. 7

AO 245B (Rev. 11/16)   Judgment in a Criminal Case
               Sheet 3 — Supervised Release

Judgment—Page ___3___ of ___7___

DEFENDANT:  ERIC ROBERT JOHNSON
CASE NUMBER:  **1: 22  CR  10066   - 01   - DJC**

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of :        5     year(s)

## MANDATORY CONDITIONS

1.   You must not commit another federal, state or local crime.
2.   You must not unlawfully possess a controlled substance.
3.   You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
           ☐ The above drug testing condition is suspended, based on the court's determination that you
               pose a low risk of future substance abuse. *(check if applicable)*
4.   ☑ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
5.   ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (42 U.S.C. § 16901, *et seq*.) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
6.   ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

# Add. 8

AO 245B (Rev. 11/16)    Judgment in a Criminal Case
Sheet 3A — Supervised Release

Judgment—Page ___4___ of ___7___

DEFENDANT:  ERIC ROBERT JOHNSON
CASE NUMBER:    1: 22 CR 10066  - 01  - DJC

# STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision.  These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1.   You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2.   After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3.   You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4.   You must answer truthfully the questions asked by your probation officer.
5.   You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6.   You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7.   You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so.  If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8.   You must not communicate or interact with someone you know is engaged in criminal activity.  If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9.   If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10.  You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11.  You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12.  If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction.  The probation officer may contact the person and confirm that you have notified the person about the risk.
13.  You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature _____    Date _____

Add. 9

AO 245B(Rev. 11/16)
Judgment in a Criminal Case
Sheet 3D — Supervised Release

Judgment—Page ___5___ of ___7___

DEFENDANT: ERIC ROBERT JOHNSON
CASE NUMBER: **1: 22 CR 10066   - 01   - DJC**

## SPECIAL CONDITIONS OF SUPERVISION

See attached list.

**Add. 10**

AO 245B (Rev. 11/16)    Judgment in a Criminal Case
Sheet 5 — Criminal Monetary Penalties

Judgment — Page ___6___ of ___7___

DEFENDANT: ERIC ROBERT JOHNSON
CASE NUMBER:    1: 22 CR 10066  - 01  - DJC

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | JVTA Assessment* | Fine | Restitution |
|---|---|---|---|---|
| TOTALS | $ 100.00 | $ | $ | $ |

☐  The determination of restitution is deferred until _____ . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐  The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below.  However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| Angela | $3,000.00 | $3,000.00 | |
| April | $4,000.00 | $4,000.00 | |
| Blue Pillow | $3,000.00 | $3,000.00 | |
| Sweet White Sugar | $3,000.00 | $3,000.00 | |
| Cindy | $3,000.00 | $3,000.00 | |
| Jessica | $3,500.00 | $3,500.00 | |
| Misty | $3,500.00 | $3,500.00 | |
| Jenny | $3,500.00 | $3,500.00 | |
| Vicky | $7,500.00 | $7,500.00 | |
| Marineland | $4,000.00 | $4,000.00 | |
| | | | |
| TOTALS | $ 38,000.00 | $ 38,000.00 | |

☐  Restitution amount ordered pursuant to plea agreement  $ _____

☐  The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f).  All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐  The court determined that the defendant does not have the ability to pay interest and it is ordered that:

    ☐  the interest requirement is waived for the    ☐  fine   ☐  restitution.

    ☐  the interest requirement for the    ☐  fine   ☐  restitution is modified as follows:

* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

## Add. 11

Judgment — Page ____7____ of ____7____

DEFENDANT:  ERIC ROBERT JOHNSON
CASE NUMBER:   **1: 22  CR  10066  - 01  - DJC**

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

A  ☑  Lump sum payment of $ ___38,100.00___   due immediately, balance due

   ☐  not later than _____ , or
   ☐  in accordance with  ☐  C,   ☐  D,   ☐  E, or   ☐  F below; or

B  ☑  Payment to begin immediately (may be combined with   ☐ C,   ☐ D, or   ☑ F below); or

C  ☐  Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of
   _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after the date of this judgment; or

D  ☐  Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of
   _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after release from imprisonment to a
   term of supervision; or

E  ☐  Payment during the term of supervised release will commence within _____ *(e.g., 30 or 60 days)* after release from
   imprisonment.  The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F  ☑  Special instructions regarding the payment of criminal monetary penalties:

   Payment to be made on a monthly schedule to be determined by Probation. Any payment made, that is not
   payment in full, shall be divided proportionately among the parties named. Payment of the restitution shall begin
   immediately and shall be made according to the requirements of the Federal Bureau of Prisons' Inmate Financial
   Responsibility Program while the defendant is incarcerated. All restitution payments shall be made to the Clerk,
   U.S. District Court for transfer to the identified victims.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during
the period of imprisonment.  All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate
Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐  Joint and Several

   Defendant and Co-Defendant Names and Case Numbers *(including defendant number)*, Total Amount, Joint and Several Amount,
   and corresponding payee, if appropriate.

☐  The defendant shall pay the cost of prosecution.

☐  The defendant shall pay the following court cost(s):

☑  The defendant shall forfeit the defendant's interest in the following property to the United States:
   See Preliminary Order of Forfeiture attached.

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine
interest, (6) community restitution, (7) JVTA assessment, (8) penalties, and (9) costs, including cost of prosecution and court costs.

# Add. 12

US v. Eric Johnson Conditions of Release

1. You must pay the balance of any fine or restitution imposed according to a court-ordered repayment schedule.

2. You are prohibited from incurring new credit charges or opening additional lines of credit without the approval of the Probation Office while any financial obligations remain outstanding.

3. You must provide the Probation Office access to any requested financial information, which may be shared with the Asset Recovery Unit of the U.S. Attorney's Office.

4. Pursuant to the Adam Walsh Child Protection and Safety Act of 2006, you shall register as a sex offender not later than 3 business days (from release or sentencing, if granted probation). You will keep the registration current, in each jurisdiction where you reside, are employed or are a student. You must, not later than 3 business days after each change in name, residence, employment, or student status, appear in person in at least one jurisdiction in which you are registered and inform that jurisdiction of all changes in the information. Failure to do so may not only be a violation of this condition but also a new federal offense punishable by up to 10 years' imprisonment. In addition, you must read and sign the Offender Notice and Acknowledgment of Duty to Register as a Sex Offender per the Adam Walsh Child Protection and Safety Act of 2006 form.

5. You must participate in a sexual specific evaluation or sex offender specific treatment, conducted by a sex offender treatment provider, as directed and approved by the Probation Office. The treatment provider shall be trained and experienced in the treatment of sexual deviancy and follow the guideline practices established by the Association for the Treatment of Sexual Abusers (ATSA). The sexual specific evaluation may include psychological and physiological testing which may include polygraph testing and the Visual Reaction Time Assessment (e.g. ABEL screen). You must disclose all previous sex offender or mental health evaluations to the treatment provider.

6. You must submit to periodic polygraph testing as a means to ensure that you are in compliance with the requirements of your supervision or treatment program. When submitting to a polygraph exam, you do not waive your Fifth Amendment rights, and your exercise of such rights will not give rise to a violation proceeding. The results of the polygraph examinations may not be used as evidence in Court to prove that a violation of community supervision has occurred but may be considered in a hearing to modify release conditions and/or could initiate a separate investigation.

7. You must allow the installation of computer internet monitoring software on approved internet capable devices but may still use a computer for work purposes that has been previously approved by the Probation Office. The program(s) used will be designed to identify, for the Probation Office, the viewing, downloading, uploading, transmitting, or otherwise using any images or content of a sexual or otherwise inappropriate nature. You must not attempt to remove or otherwise defeat such systems and must allow the Probation Office to examine such computer and receive data from it at any reasonable time.

8. You must advise anyone using the monitored internet capable devices that those devices are being monitored by the Probation Office.

# Add. 13

9. You must not possess or use any computer or internet-capable device without prior approval from the Probation Office. Any such device should not be used to knowingly access or view sexually explicit materials as defined in 18 U.S.C. §2256(2)(A).

10. You must disclose all account information relative to internet access, social networking, and email, including usernames and passwords, to the Probation Office. You must also, if requested, provide a list of all software/hardware on your computer, as well as telephone, cable, or internet service provider billing records and any other information deemed necessary by the Probation Office to monitor your computer usage.

11. You must provide the probation officer with access to any requested financial information for purposes of monitoring compliance with the imposed computer access/monitoring conditions, including, but not limited to, credit card bills, telephone bills, and cable/satellite television bills.

12. You must not knowingly have direct contact, or contact through a 3rd party, with children under the age of 18, unless previously approved by the Probation Office, or in the presence of a responsible adult who has been approved by the Probation Office, and who is aware of the nature of your background and current offense.

13. You must not knowingly have any contact with victim(s) without prior approval of the Probation Office. This includes letters, communication devices, audio or visual devices, visits, social networking sites, or third parties not covered by any other condition.

14. You must consent to third party disclosure to any employer or potential employer concerning any computer-related restrictions that are imposed upon you, unless excused by the probation officer. You are prohibited from being employed in any capacity that may cause you to come in direct contact with children, except under circumstances approved in advance by the supervising probation officer. In addition, you must not participate in any volunteer activity that may cause you to come into direct contact with children, except under circumstances approved in advance by the probation officer. Contact is defined as any transaction occurring face to face, over the telephone, via mail, over the internet, and any third-party communication.

15. Prior to accepting any form of employment, you must seek the approval of the Probation Office, in order to allow the Probation Office, the opportunity to assess the level of risk to the community you may pose if employed in a particular capacity.

16. You shall be required to contribute to the costs of evaluation, treatment, programming, and/or monitoring (*see* Special Condition #5 thought #7), based on the ability to pay or availability of third-party payment.

## Add. 14

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 22-10066-DJC |
| | ) | |
| ERIC ROBERT JOHNSON, | ) | |
| Defendant. | ) | |

**PRELIMINARY ORDER OF FORFEITURE**

**CASPER, D.J.**

WHEREAS, on March 23, 2022, a federal grand jury sitting in the District of

Massachusetts returned a one-count Indictment, charging the Defendant with Possession of Child

Pornography, in violation of 18 U.S.C. §§ 2252A(a)(5)(B) and (b)(2) (Count One);

WHEREAS, the Indictment included a Child Pornography Forfeiture Allegation,

pursuant to 18 U.S.C. § 2253, which provided notice that the United States intended to seek the

forfeiture, upon conviction of the Defendant of the offense alleged in Count One of the

Indictment, of (i) any visual depiction described in sections 2251, 2251A, 2252, 2252A, 2252B,

or 2260 of Chapter 110 of Title 18; or any book, magazine, periodical, film, videotape, or other

matter which contains any such visual depiction, which was produced, transported, mailed,

shipped or received in violation of Chapter 110 of Title 18; (ii) any property, real or personal,

constituting or traceable to gross profits or other proceeds obtained from such offenses; and (iii)

any property, real or personal, used or intended to be used to commit or to promote the

commission of such offenses or any property traceable to such property;

WHEREAS, the property to be forfeited included, but was not limited to, the following:

a.    Toshiba External Drive, Serial Number 94CATIZGT19B; and

b.    HP Laptop Computer, Serial Number S1D9NSAF903388L;

**Add. 15**

WHEREAS, the Indictment further provided that, if any of the above-described forfeitable property, as a result of any act or omission by the Defendant, (a) cannot be located upon the exercise of due diligence; (b) has been transferred or sold to, or deposited with, a third party; (c) has been placed beyond the jurisdiction of the Court; (d) has been substantially diminished in value; or (e) has been commingled with other property which cannot be divided without difficulty, it is the intention of the United States, pursuant to 18 U.S.C. § 2253(b), incorporating 21 U.S.C. § 853(p), to seek forfeiture of any other property of the Defendant, up to the value of the property described above;

WHEREAS, on January 6, 2024, the United States filed a Bill of Particulars for Forfeiture of Assets, providing notice of additional property seized from the Defendant that the government intended to forfeit pursuant to 18 U.S.C. § 2253, as a result of violations of 18 U.S.C. §§ 2252A(a)(5)(B) and (b)(2);

WHEREAS, the Bill of Particulars identified properties representing: (i) any visual depiction described in sections 2251, 2251A, 2252, 2252A, 2252B, or 2260 of Chapter 110 of Title 18; or any book, magazine, periodical, film, videotape, or other matter which contains any such visual depiction, which was produced, transported, mailed, shipped, or received in violation of Chapter 110 of Title 18; (ii) any property, real or personal, constituting or traceable to gross profits or other proceeds obtained from such offenses; and (iii) any property, real or personal, used or intended to be used to commit or to promote the commission of such offense or any property traceable to such property, including but not limited the following specific property:

    c.      Apricorn, Inc. Silver USB 3.0 with no serial number;

    d.      Seagate External Hard Drive, Serial No. NAOQ43VS;

Add. 16

e.      Iomega External Hard Drive, Serial No. 97A942274E;

f.      Samsung Galaxy Cell Phone Model No. SM-G970U, IMEI No. 354772100830583;

g.      Toshiba Disk Drive, Serial No. SICMSID9ECA;

h.      USB Micro Storage Device (Thumb Drive), Serial No. Unknown, Model Unknown;

i.      ASUS laptop, Serial No. E3NDLX004504188;

j.      Seagate External Hard Drive, Serial No. NAABPKJZ;

k.      Seagate 4TB hard drive, Serial No. NA7P7SHD;

l.      Seagate external hard drive, Serial No. NA8FT62C;

m.      Seagate external hard drive, Serial No. NA7F2P20;

n.      Western Digital Elements external hard drive, Serial No.JEHT418M;

o.      Seagate hard drive, Serial No. 5ND3G07L;

p.      Maxtor Hard drive, Model No. 9204104;

q.      Hard Drive - Silver in Color, Serial No. Unknown, Model No. Unknown;

r.      Seagate external drive, Serial No. ZGHKCZHG, with cord;

s.      Samsung tablet, Serial No. Unknown, Model No. Unknown;

t.      Western Digital hard drive, Serial No. WCAD12929524;

u.      Toshiba Disk Drive, Serial No. 63JNP4E5TYN6HDKBB96T3A02T; and

v.      External hard drive with faraday bag, Serial No. 93QMP876TXR6

(collectively, Items a. – v. above, the "Properties");

WHEREAS, on January 29, 2024, at a hearing pursuant to Rule 11 of the Federal Rules of Criminal Procedure, the Defendant plead guilty to Count One of the Indictment, pursuant to a

Add. 17

written plea agreement signed by the Defendant on January 29, 2024;

WHEREAS, in Section 6 of the written plea agreement, the Defendant agreed that the Court will, upon acceptance of the Defendant's guilty plea, enter an order of forfeiture as part of the Defendant's sentence, and that the order of forfeiture may include assets directly traceable to the Defendant's offense, assets used to facilitate the Defendant's offense, substitute assets and/or a money judgment equal to the value of the property derived from, or otherwise involved in, the offense;

WHEREAS, the assets to be forfeited specifically included, without limitation, the Properties;

WHEREAS, the Defendant admitted that the Properties are subject to forfeiture on the grounds that they were used to facilitate the Defendant's offense and/or they were involved in the Defendant's offense, and in addition, the Defendant agreed to consent to the entry of an order of forfeiture against the Properties;

WHEREAS, in light of the Defendant's guilty plea and admissions in the written plea agreement, the United States has established the requisite nexus between the Properties and the offenses to which the Defendant pled guilty, and accordingly, the Properties are subject to forfeiture to the United States pursuant to 18 U.S.C. § 2253; and

WHEREAS, pursuant to 18 U.S.C. § 2253 and Rule 32.2(b)(2) of the Federal Rules of Criminal Procedure, the United States is now entitled to a Preliminary Order of Forfeiture against the Properties.

ACCORDINGLY, it is hereby ORDERED, ADJUDGED, AND DECREED that:

1.    The Court finds, pursuant to Rule 32.2(b)(1) of the Federal Rules of Criminal

4

**Add. 18**

Procedure, that the United States has established the requisite nexus between the Properties and the offenses to which the Defendant plead guilty.

2.      The Court shall retain jurisdiction in this case for the purpose of enforcing this Order.

3.      Accordingly, all of Defendant's interests in the Properties are hereby forfeited to the United States of America for disposition pursuant to 18 U.S.C. § 2253.

4.      Pursuant to Rule 32.2(b)(3) of the Federal Rules of Criminal Procedure, the United States is hereby authorized to seize the Properties and maintain them in its secure custody and control.

5.      Pursuant to 18 U.S.C. § 2253, incorporating 21 U.S.C. § 853(n)(1), the United States shall publish, for thirty (30) consecutive calendar days on the government forfeiture website www.forfeiture.gov, notice of the Preliminary Order of Forfeiture and notice of the United States' intent to dispose of the Properties.

6.      Pursuant to 18 U.S.C. § 2253, incorporating 21 U.S.C. § 853(n)(1), the United States shall give, to the extent practicable, direct written notice to any person known to have alleged an interest in the Properties to be forfeited.

7.      Pursuant to 18 U.S.C. § 2253, incorporating 21 U.S.C. § 853(n)(2) and (3), the notice referred to above shall state: (a) that any person, other than the Defendant, asserting a legal interest in the Properties, shall, within sixty (60) days after the first day of publication on the government forfeiture website or within thirty (30) days after receipt of actual notice, whichever is earlier, file a petition with the United States District Court in Boston, Massachusetts, requesting a hearing to adjudicate the validity of his or her interest in the

Add. 19

Properties, and (b) that the petition shall be signed by the petitioner under the penalty of perjury, and shall set forth the nature and extent of the petitioner's right, title, or interest in the Properties, the time and circumstances of the petitioner's acquisition of the right, title, or interest in the Properties, any additional facts supporting the petitioner's claim, and the relief sought.

8.      Pursuant to 18 U.S.C. § 2253, incorporating 21 U.S.C. § 853(n)(7), following the Court's disposition of all petitions filed under 21 U.S.C. § 853(n)(6), or if no such petitions are filed following the expiration of the period provided in 21 U.S.C. § 853(n)(2) for the filing of such petitions, the United States of America shall have clear title to the Properties.

9.      Upon adjudication of all third-party interests, this Court will enter a Final Order of Forfeiture, pursuant to 18 U.S.C. § 2253 and Rule 32.2(c) of the Federal Rules of Criminal Procedure, in which all interests will be addressed.

10.      Pursuant to Rule 32.2(b)(4) of the Federal Rules of Criminal Procedure, this Preliminary Order of Forfeiture will become final as to the Defendant at the time of his sentencing, will be part of the Defendant's criminal sentence, and will be included in the criminal judgment entered by this Court against him.

_____
DENISE J. CASPER
United States District Judge

Dated: May 10, 2024
_____

6

**Add. 20**